# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANDON HUGHES, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>NATIONAL FOOTBALL LEAGUE,<br><br>    Defendant. | Case No. 1:22-cv-10743-JLR<br><br>**ORAL ARGUMENT REQUESTED** |

## NATIONAL FOOTBALL LEAGUE'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS

**VINSON & ELKINS L.L.P.**

Hilary L. Preston
Marisa Antonelli
1114 Avenue of Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
mantonelli@velaw.com

*Counsel for National Football League*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND ...................................................................................3

    A.   The NFL Offers Video and Non-Video Content to Visitors to Its Website for Free and Without Requiring Visitors to Create an Account. ............................3

    B.   The Alleged Disclosures Come From the User's Browser and Are Not Accessed or Disclosed By the NFL. ...................................................4

    C.   Mr. Hughes Accepted the NFL's Data Collection and Sharing Policies and Class-Action Waiver. ...................................................7

LEGAL STANDARD ..............................................................................................8

ARGUMENT ........................................................................................................10

  I.   Mr. Hughes Lacks Article III Standing. ...........................................10

    A.   *TransUnion* Requires Plaintiffs Alleging "Intangible" Harm to Show a "Close Relationship" to the Elements of a Traditional Common-Law Cause of Action. ...................................................10

    B.   Mr. Hughes Does Not Allege a Harm with the Requisite "Close Relationship" to Harms Traditionally Recognized as Providing a Basis for Suit. ...................................................11

    C.   Mr. Hughes Cannot Rely on Unpersuasive, Superseded, and Non-Binding Authority to Avoid His Duty to Show a Concrete Injury-in-Fact. ...............14

  II.   Mr. Hughes Fails to Allege Facts to Support a VPPA Claim. ..........................16

    A.   Mr. Hughes Fails to Allege Facts that Qualify Him as a VPPA "Consumer." .....................................................16

    B.   The NFL Did Not "Knowingly Disclose" Any PII. ...............................20

      1.   The Alleged Disclosures of PII Were Made by Mr. Hughes's Device, Not the NFL. ...................................................20

      2.   The NFL Did Not "Knowingly" Disclose PII. ...............................22

  III.   The Court Should Dismiss the Complaint's Class Allegations. .....................23

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullayeva v. Attending Homecare Servs. LLC*,
   928 F.3d 218 (2d. Cir. 2019) ................................................................................................ 23

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) .................................................................................................. 9

*ASARCO LLC v. Goodwin*,
   756 F.3d 191 (2d Cir. 2014) .................................................................................................. 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................... 9

*Aubrey v. New Sch.*,
   No. 21-cv-4915, 2022 WL 3867832 (S.D.N.Y. Aug. 30, 2022) ........................................... 8

*Austin-Spearman v. AMC Network Ent. LLC*,
   98 F. Supp. 3d 662 (S.D.N.Y. 2015) ...................................................................... 17, 18, 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................... 9

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ............................................................................................................. 22

*Chutich v. Green Tree Acceptance, Inc.*,
   No. 88-cv-869, 1993 WL 173813 (D. Minn. Apr. 19, 1993) ............................................. 21

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*,
   790 F.3d 411 (2d Cir. 2015) ...................................................................................... 8, 9, 14

*Czarnionka v. Epoch Times Association, Inc.*,
   No. 22-cv-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ........................................ 21

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) .............................................................................................. 14

*Ellis v. Cartoon Network, Inc.*,
   803 F.3d 1251 (11th Cir. 2015) ..................................................................................... 17, 18

*Faehner v. Webcollex, LLC*,
   No. 21-cv-1734, 2022 WL 500454 (2d Cir. Feb. 18, 2022) .......................................... 10, 15

*Glick v. CMRE Fin. Servs., Inc.*,
   No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022) ............................... 13, 14, 15, 16

*Harty v. W. Point Realty, Inc.*,
   28 F.4th 435 (2d Cir. 2022) ................................................................................................ 11

*Horton v. Dow Jones & Co.*,
   804 F. App'x 81 (2d Cir. 2020) ................................................................................. 23, 24, 25

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
    48 F.4th 1236 (11th Cir. 2022) .............................................................. 12, 13, 14, 15

*In re Hulu Priv. Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ........................................................ 21, 22

*In re Hulu Priv. Litig.*,
    No. 11-cv-03764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ............................. 22

*In re Nickelodeon Consumer Priv. Litig.*,
    827 F.3d 262 (3d Cir. 2016) ................................................................... 14

*In re Thelen LLP*,
    736 F.3d 213 (2d Cir. 2013) ................................................................ 9, 10

*In re UBS Auction Rate Secs. Litig.*,
    No. 08-cv-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................... 10

*Kola v. Forster & Garbus LLP*,
    No. 19-cv-10496, 2021 WL 4135153 (S.D.N.Y. Sept. 10, 2021) ......................... 11

*Lebakken v. WebMD, LLC*,
    No. 22-cv-644, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ............................ 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 9

*Maddox v. Bank of N.Y. Mellon Tr. Co.*,
    19 F.4th 58 (2d Cir. 2021) ................................................. 11, 12, 14, 15

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) .................................................................. 8

*Martin v. Meredith Corp.*,
    No. 22-cv-4776, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) ........................... 15

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ....................................................... 9

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) .................................................................. 23

*Mollett v. Netflix, Inc.*,
    795 F.3d 1062 (9th Cir. 2015) .......................................................... 12, 16, 20

*Orozco v. Fresh Direct, LLC*,
    No. 15-cv-8226, 2016 WL 5416510 (S.D.N.Y. Sept. 27, 2016) ........................... 10

*Peerless Ins. Co. v. Law Offices of Jason E. Taylor P.C.*,
    No. 19-cv-126, 2020 WL 4370941 (W.D.N.C. July 8, 2020), *memorandum and
    recommendation adopted*, 2020 WL 4369446 (W.D.N.C. July 30, 2020) ............... 20

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ............................................................. 14

*Phillips v. Saratoga Harness Racing, Inc.*,
    240 F.3d 174 (2d Cir. 2001) ................................................................. 19

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)........................................................................................ 12

*Roman v. Spirit Airlines, Inc.*,
   482 F. Supp. 3d 1304 (S.D. Fla. 2020) ......................................................... 24

*Shields v. Pro. Bureau of Collections of Md., Inc.*,
   55 F.4th 823 (10th Cir. 2022) ........................................................... 13, 14, 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................ 14

*Sputz v. Alltran Fin., LP*,
   No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) .............. 11, 13, 14, 15

*T.K. Through Leshore v. Bytedance Tech. Co.*,
   No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ........................ 25

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)............................................................................. *passim*

*Tsadilas v. Providian Nat'l Bank*,
   786 N.Y.S.2d 478 (1st Dep't 2004) ............................................................... 25

*U1it4Less, Inc. v. FedEx Corp.*,
   No. 11-cv-1713, 2015 WL 3916247 (S.D.N.Y. June 25, 2015) ..................... 24

*Wilson v. Veritas Consulting Grp. Inc.*,
   No. 21-cv-8318, 2022 WL 4227145 (S.D.N.Y. Sept. 13, 2022) .................... 10

**Statutes**

10 U.S.C. § 949p-5 ................................................................................................ 22

15 U.S.C. § 6821 ................................................................................................... 22

18 U.S.C. § 2710 ............................................................................................ 16, 25

18 U.S.C. § 2710(a) .............................................................................................. 17

18 U.S.C. § 2710(a)(1) .............................................................................. 16, 18, 19

18 U.S.C. § 2710(a)(3) ...................................................................................... 4, 19

18 U.S.C. § 2710(a)(4) .......................................................................................... 19

18 U.S.C. § 2710(b)(1) .................................................................................... 20, 22

18 U.S.C. App. 3 § 5 ............................................................................................. 22

**Rules**

Fed. R. Civ. P. 12(b)(1).............................................................................. 1, 8, 9, 14

Fed. R. Civ. P. 12(b)(6)............................................................................... 1, 9, 10

**Other Authorities**

*Cookies Policy – If You Have a Facebook Account*, Facebook.com,
    https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-4.1 ....................... 5, 6

*Cookies Policy*, Facebook.com, https://www.facebook.com/privacy/policies/cookies ............ 5, 14

David A. Elder, *Privacy Torts* § 3:9 (Dec. 2022 Update) ........................................................... 14

NFL.com, https://id.nfl.com/account/sign-up ................................................................................ 7

NFL.com, Privacy Policy,  https://www.nfl.com/legal/privacy ...................................................... 8

NFL.com, Terms and Conditions, https://www.nfl.com/legal/terms ............................................. 8

NFL.com, Videos, https://www.nfl.com/videos ............................................................................. 3

Restatement (Second) of Torts § 652F cmt. b (Am. Law Inst. Mar. 2023 Update) .................... 14

William L. Prosser, *Privacy*, 48 Calif. L. Rev. 353 (1960) ........................................................ 14

Defendant National Football League (the "NFL") submits this memorandum of law in support of its motion to dismiss the putative class action complaint filed by Brandon Hughes ("Mr. Hughes"), *see* Dkt. 40 (the "Complaint" or "Compl."), pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Mr. Hughes's lawsuit seeks to impose potentially enormous liability under the Video Privacy Protection Act ("VPPA")—a 1988 law that prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" ("PII") of "consumers" of that video tape service provider—because when he accessed freely available online video content on the NFL's website, a piece of code created by Facebook and installed on the NFL's website—the Facebook Pixel—allegedly caused his own device's browser to send information about his browsing activity to Facebook. Although Mr. Hughes contends that he and potentially numerous other individuals are entitled to substantial statutory damages from the NFL as a result, he does not actually allege that the NFL discloses any PII, nor any harm or surprise from Facebook's tracking of his browsing activity on NFL.com. Indeed, Mr. Hughes voluntarily signed up for an account with Facebook and authorized Facebook to track his browsing activity on third party websites like the NFL's pursuant to Facebook's own terms of service and privacy policies. Those policies make clear to Facebook's account holders that Facebook places cookies on their browsers and utilizes other code to track their activities across the Internet. The Court should reject Mr. Hughes's suit.

Dozens of virtually identical class-action VPPA suits are currently pending around the country against other third-party websites that have the Facebook Pixel on them. These include numerous substantively identical complaints filed against various entities by Mr. Hughes's attorneys alone, with cookie-cutter allegations that lack any meaningful tailoring to the websites

1

at issue.  All of these suits share a common denominator: they are all brought on behalf of Facebook users who are complaining about Facebook's access to information about their browsing activities, and thereby are attempting an end-run around Facebook's own privacy policies—which disclose in detail that Facebook uses various technologies to track information about their activities on third-party websites—which they have consented to.  Mr. Hughes's Complaint, in particular, suffers from several fatal defects.

First, Mr. Hughes lacks Article III standing because he does not and cannot allege any injury-in-fact as a result of truthful, non-public disclosures of his NFL.com browsing activity to Facebook, particularly where he has consented to Facebook's tracking under Facebook's own terms.  *See infra* Section I.  Second, the Complaint fails to plausibly state a claim.  VPPA claims are available only:  (i) to "consumers" (i.e., "renter[s], purchaser[s], or subscriber[s]" of a "video tape service provider") (ii) against a defendant who "knowingly disclose[d]" "personally identifiable information" as defined by the VPPA.  But Mr. Hughes does *not* plausibly allege that he is a "renter, purchaser, or subscriber" of goods or services on NFL.com, much less of any "video tape services" (*see infra* Section II.A); and the NFL did *not* knowingly disclose PII about him (*see infra* Section II.B).  No factual discovery will alter these fatal legal flaws.  Mr. Hughes's allegations, even taken as true, fail to plausibly state a VPPA claim against the NFL.

Additionally, counsel's effort to pursue these claims on a class basis must be rejected. Mr. Hughes consented to the NFL's Terms and Conditions, which include an enforceable agreement that any disputes will be resolved "solely on an individual basis" and neither Mr. Hughes nor the NFL can bring any claims "as a class action."  *See infra* Section III.  Mr. Hughes waived the ability to bring claims on a class basis, and the class allegations should be dismissed.

## FACTUAL BACKGROUND

A. **The NFL Offers Video and Non-Video Content to Visitors to Its Website for Free and Without Requiring Visitors to Create an Account.**

The NFL operates a football league comprised of 32 teams. The NFL's website, NFL.com, features a broad selection of content, including video and non-video offerings. *Cf.* Compl. ¶ 13; *see also id.* ¶ 37. Mr. Hughes alleges that he watched videos on NFL.com. *Id.* ¶ 12. Mr. Hughes does not allege this content is restricted to any "subscriber," nor could he, as the NFL offers the content described in the Complaint freely to all internet visitors. Instead, Mr. Hughes alleges that he became a "digital subscriber of NFL.com," by which he means that he "register[ed] for NFL.com" and "sign[ed] up for an online newsletter." *Id.* ¶¶ 20, 44. The "opening [of] an account" merely entailed providing basic information like a "name, email address, and zip code." *Id.* ¶¶ 20, 24. Mr. Hughes does not allege that by opening an account and signing up for a newsletter he received access to any premium video content on NFL.com that is not already accessible to any internet user. The only goods and services Mr. Hughes alleges he received through his "subscription" are "emails and other communications from NFL.com"—none of which are alleged to include delivery of video content. *Id.* ¶ 44.

Critically, although Mr. Hughes alleges he is a "subscriber" to NFL.com, Mr. Hughes does not allege that any subscription or registration to NFL.com is necessary to access the videos he viewed, all of which are freely accessible to anyone at no cost and requiring no registration, subscription, or account login.[1] Neither the content, nor Mr. Hughes's access to it, has anything to do with his purported "subscription"; nor does the alleged disclosure of information to Facebook, which as discussed below occurs not because of any "subscription" with NFL.com, but

---

[1] *See, e.g.*, videos accessible through NFL.com, Videos, https://www.nfl.com/videos (last accessed Mar. 1, 2023).

because Mr. Hughes holds an account with Facebook and has agreed to Facebook's terms and privacy policies. Indeed, the open-access nature of the video content at issue is explicitly acknowledged in the Complaint. In the screenshot depicted in paragraph 37, which Mr. Hughes admits is "publicly available evidence," a general "user" (i.e., not a "subscriber" of any kind) visits NFL.com and clicks a link to watch a video titled "Burton: Jalen Ramsey refusing to praise Bills ahead of Week 1 matchup." *Id.* ¶ 37. The screenshot includes in the top right corner a link labeled "Sign In," making clear the user is not signed in to any account or subscription on NFL.com, yet may nevertheless view the video. *Id.* Not only that, as the screenshots in paragraph 38 purport to show, information about the user and the video accessed by the user is also nevertheless shared with Facebook, demonstrating that the alleged disclosure of information to Facebook has nothing to do with any subscription to NFL.com, but rather occurs because a user has a Facebook account and is logged into Facebook when visiting NFL.com. *Id.* ¶ 38.

> **B.** **The Alleged Disclosures Come From the User's Browser and Are Not Accessed or Disclosed By the NFL.**

Mr. Hughes contends that he signed up for Facebook and browsed NFL.com while logged into Facebook, and that the NFL violated the VPPA because personally identifiable information about his video-viewing on NFL.com was disclosed to Facebook. Compl. ¶¶ 12, 45. Under the VPPA, personally identifiable information "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The Complaint alleges that PII is disclosed because NFL.com "sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID [Facebook ID] to Facebook." Compl. ¶ 38. Despite this general allegation, the Complaint acknowledges that a user's FID is stored only (if at all) in a cookie on the user's own device browser. *Id.* ¶ 31. Indeed, the Complaint does not allege that the NFL ever actually

*possesses* a user's FID information. *Cf. Id.* ¶ 34 (alleging "database" of certain information, without mention of FIDs). And although the Complaint uses the term "digital subscriber" here, it is plain from the face of the Complaint that these disclosures have no relationship to Mr. Hughes's purported status as a "digital subscriber" of NFL.com (i.e., someone who "open[ed] an account" and "sign[ed] up for an online newsletter"). *Id.* ¶¶ 20, 22, 24. As noted above, his own proffered example of a disclosure to Facebook shows a user who is *not* logged into any NFL.com account. *Id.* ¶ 37.

On the contrary, the Complaint makes clear the alleged disclosures occur because of Mr. Hughes's status as a "Facebook account" holder with a Facebook "FID cookie[] on [his] browser." *Id.* ¶¶ 12, 31. Indeed, if a purported "digital subscriber" of NFL.com logged in and browsed videos on NFL.com but did not have a Facebook account and an FID cookie installed on their browser, the alleged disclosures to Facebook would not occur. Facebook informs its account holders, like Mr. Hughes, that Facebook "place[s] cookies on your computer or device and receive[s] information stored in cookies when you use or visit [other sites]." *Cookies Policy*, Facebook.com, https://www.facebook.com/privacy/policies/cookies (eff. Oct. 5, 2022). Although Mr. Hughes asserts that this data-sharing was not his "decision," Compl. ¶ 31, he does not dispute that it was his decision to sign up for a Facebook account and to browse NFL.com "while logged into his Facebook account," *id.* ¶ 12.

Nor did he make that decision without having consented, as a Facebook user, to the disclosures at issue. As Facebook's current terms explain, Facebook collects data about users' activities across the Internet through cookies and tools like Facebook Pixel, including information about the websites they visit and the content they interact with, including videos. *See generally Cookies Policy*, Facebook.com, https://www.facebook.com/privacy/policies/cookies (eff. Oct. 5, 2022). Facebook's terms explain that Facebook uses information about such "off-Facebook

activity" (i.e., browsing on other websites) to help "give [users] a more personalised experience," such as showing more relevant ads to them. *See Cookies Policy – If You Have a Facebook Account*, Facebook.com, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-4.1 (eff. Oct. 5, 2022). Mr. Hughes does not allege that, as a Facebook account holder, he lacked notice of these facts about how Facebook works.

Nor does the Complaint plausibly assert that the alleged disclosure itself *came from the NFL*. To the contrary, the Complaint acknowledges that the disclosure comes from a user's own browser, which transmits an FID stored in a cookie on the user's browser that is placed by Facebook, along with video-viewing information, directly to Facebook. Compl. ¶ 31. Mr. Hughes alleges this is the result of the "Facebook tracking pixel," *id.* ¶ 29—an allegation that ignores the fact that Facebook cannot identify a user unless the user consents to Facebook placing a cookie on their browser with an FID for this very purpose, and browses on third party sites like NFL.com while signed into Facebook. But as the Complaint also explains, the "Facebook tracking pixel" itself consists of "code from Facebook," not the programming of the NFL. *Id.* ¶ 29. Further, the Complaint makes clear the information is "sent *from the device* to Facebook," not from the NFL to Facebook. *Id.* ¶ 38 (emphasis added). At no point does the Complaint allege (nor could it) that the disclosure shown in paragraph 38 originates from, or is transmitted by or to, the NFL. Notably, the Complaint does not allege that the pixel-generated disclosure to Facebook includes any personal information possessed by the NFL—no names, email addresses, IP address data, or any other information purportedly collected by the NFL when Mr. Hughes signed up on NFL.com. *Id.* ¶¶ 20, 34, 44. The alleged identifying information is simply the "c_user" field—a string of numbers ("767858528") constituting an FID assigned and placed by Facebook—sent from a user's device. *Id.* ¶ 38. No further disclosure of a personal identifier occurs or is alleged.

**C. Mr. Hughes Accepted the NFL's Data Collection and Sharing Policies and Class-Action Waiver.**

The Complaint makes clear that Mr. Hughes also consented to the NFL's policies—which include a class-action waiver. All NFL.com users consent to the league's Privacy Policy when they navigate to NFL.com. A pop-up banner immediately appears that states: "By clicking 'Accept Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Declaration of Hilary Preston in Support of Motion to Dismiss ¶ 3 ("Preston Decl."), Ex. A (screenshot of pop-up). This pop-up banner does not leave the screen until a user clicks "Reject cookies," "Accept Cookies," or the "X" in the upper right-hand corner. The Privacy Policy is hyperlinked in the banner, allowing users to review the disclosure terms prior to accessing any videos or navigating to any other content on NFL.com. *Id.*

Moreover, a user who "register[s] for NFL.com[]" and "sign[s] up for an online newsletter," Compl. ¶ 20, as Mr. Hughes alleges to have done, is given notice of the same Privacy Policy, and the NFL's Terms and Conditions, at the point they submit their email address, and in doing so, agrees to both. To do so, users create a free account by inputting their name and email address, among other basic information (e.g., birthday and, optionally, zip code). Just above the button "Create Account" is a sentence informing the user that he or she agrees to the NFL's "Terms of Service" and "Privacy Policy" by creating an account. *See* Preston Decl. ¶ 4, Ex. B. The phrases "Terms of Service" and "Privacy Policy" are in bold blue text and hyperlink to the policies. *See* NFL.com, https://id.nfl.com/account/sign-up (last accessed Mar. 1, 2023). This sign-up does not give access to any video content not accessible to all website visitors, and users are not required to sign in to view such content. A person who signs up can delete his or her profile at any time.

Mr. Hughes discusses the NFL's operative Privacy Policy in the Complaint, Compl. ¶¶ 27-28, and also refers to the NFL's Terms, *id.* ¶ 27 (second paragraph labeled "27"). As the Complaint itself acknowledges, the Privacy Policy discloses that the use of NFL.com by any user may result in the collection of data including "Pages you view and links you click on within the Services." Compl. ¶¶ 27-28.[2] And despite Mr. Hughes's statement that "nowhere . . . is it disclosed" that his viewing information will be shared "with third parties, including Facebook," *id.* ¶ 27, the Privacy Policy states expressly that "social networking services may be able to collect information about you, including your activity on our Services." Preston Decl. ¶ 6, Ex. D at 8. And, importantly for this motion, the Terms and Conditions include a prominent agreement not to participate in a class action or act in a representative capacity. Preston Decl. ¶ 5, Ex. C at 1, 18.[3]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed "for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (citation omitted) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "[T]o establish standing, [Mr. Hughes] must show (i) that he suffered an injury in fact that is concrete,

---

[2] Mr. Hughes's Complaint cites the Privacy Policy as effective September 7, 2022. *See* Compl. ¶ 27 & n.4. The version included in the attached declaration is from a September 8, 2022, capture from the Internet Archive Wayback Machine. This court can take judicial notice of "publicly available information via the Wayback Machine." *Aubrey v. New Sch.*, No. 21-cv-4915, 2022 WL 3867832, at *2 (S.D.N.Y. Aug. 30, 2022) (citations omitted). The policy has subsequently been amended but the cited sections are substantively identical. *See* NFL.com, Privacy Policy, https://www.nfl.com/legal/privacy/ (last accessed Mar. 1, 2023).

[3] The version of the Terms provided in the Preston Declaration was effective at the time Mr. Hughes alleges to have signed up for NFL.com in 2020 through December 28, 2022. The current version contains a substantively identical class action waiver. *See* NFL.com, Terms and Conditions, https://www.nfl.com/legal/terms (last accessed Mar. 1, 2023).

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Mr. Hughes bears "the burden of demonstrating that [he has] standing" at the pleading stage and "must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* at 2207-08 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam). Further, in ruling on a motion to dismiss under Rule 12(b)(1), a court may rely on evidence outside the complaint. *Cortlandt*, 790 F.3d at 417.

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory allegations are not entitled to the presumption of truth on a motion to dismiss, and a plaintiff "armed with nothing more than conclusions," "labels," or "[t]hreadbare recitals of the elements of a cause of action" fails to state a claim. *Id.* at 678-81 (citation omitted). Claims that are merely possible or conceivable are subject to dismissal. *Id.* at 679-80. A court resolving a motion under Rule 12(b)(6) may refer to appropriate evidence outside the pleadings, which includes "any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). When allegations in a complaint are contradicted by documents attached thereto, documents incorporated by reference therein, or matters of public record, such allegations are not entitled to the presumption of truth on a motion to dismiss. *See, e.g.*, *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 399-400 (S.D.N.Y. 2002) (rejecting allegations in a complaint that plainly contradicted a release and waiver incorporated into the complaint).

"Matters judicially noticed by the District Court are not considered matters outside the pleadings." *In re Thelen*, 736 F.3d at 219 (alteration and citation omitted).

Here, the Court can consider all of NFL.com's content because it is incorporated by reference into the Complaint, and its authenticity is not in question.[4] The Privacy Policy and Terms and Conditions, attached for ease of reference as exhibits to the accompanying declaration, are explicitly incorporated by reference in, or are integral to, the Complaint, *see* Compl. ¶¶ 27-29, and are considered part of the pleadings for purposes of a Rule 12(b)(6) motion. *See Wilson v. Veritas Consulting Grp. Inc.*, No. 21-cv-8318, 2022 WL 4227145, at *1 (S.D.N.Y. Sept. 13, 2022).

## ARGUMENT

### I.     Mr. Hughes Lacks Article III Standing.

Mr. Hughes lacks standing under the Supreme Court's recent *TransUnion* decision. *See TransUnion*, 141 S. Ct. at 2203-07. A plaintiff lacks standing absent an injury-in-fact, *see id.*, and the Complaint lacks allegations to support such an injury-in-fact.

### A.     *TransUnion* Requires Plaintiffs Alleging "Intangible" Harm to Show a "Close Relationship" to the Elements of a Traditional Common-Law Cause of Action.

Mr. Hughes cannot meet the Supreme Court's test for standing by alleging a bare statutory violation. As the Second Circuit has recognized, *TransUnion* significantly "narrowed the grounds for asserting standing where the [purported] injury is primarily statutory," *Faehner v. Webcollex, LLC*, No. 21-cv-1734, 2022 WL 500454, at *1 (2d Cir. Feb. 18, 2022) (summary order), holding that Congress "may not simply enact an injury into existence." *TransUnion*, 141 S. Ct. at 2205

---

[4] *Orozco v. Fresh Direct, LLC*, No. 15-cv-8226, 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016) (assessing the "totality" of a website "incorporated by reference" into a complaint "at the center of Plaintiff['s] allegations" in resolving a motion to dismiss); *see In re UBS Auction Rate Secs. Litig.*, No. 08-cv-2967, 2010 WL 2541166, at *15 (S.D.N.Y. June 10, 2010) ("The Second Circuit, and several district courts in this Circuit, have found it appropriate to take judicial notice of the contents of a party's website for the fact of its publication.").

(citation omitted). Allegations of a bare statutory violation are thus plainly insufficient to conjure standing. *See, e.g.*, *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443-44 (2d Cir. 2022) (applying *TransUnion* to find lack of ADA standing); *Maddox v. Bank of N.Y. Mellon Tr. Co.*, 19 F.4th 58, 64-66 & n.2 (2d Cir. 2021) (same, under state mortgage-satisfaction-recording statute). Under *TransUnion*, a plaintiff must show that he or she personally suffered either tangible harms (generally physical or monetary), or an "intangible harm[]" that has "a *close relationship* to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204 (emphasis added). Mr. Hughes does not claim a physical or monetary harm, and thus must identify "a close historical or common-law analogue for [his] asserted injury" that has been "traditionally recognized" as a basis for suit. *Id.*

Crucially, *TransUnion* "clarified" that it is of "little (or no) import" whether the "*type* of harm that a statute protects against" has a relationship to harms traditionally regarded as providing a basis for suit. *Maddox*, 19 F.4th at 64 n.2 (emphasis added). Instead, the analysis is plaintiff-specific: "what matters is 'whether the alleged injury *to the plaintiff* has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Id.* (quoting *TransUnion*, 141 S. Ct. at 2204) (internal quotation marks omitted). Thus, after *TransUnion*, it is black-letter law "that, where a key element of the analogous common-law or historical harm is missing, the plaintiff lacks standing." *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) (quoting *Kola v. Forster & Garbus LLP*, No. 19-cv-10496, 2021 WL 4135153, at *6 (S.D.N.Y. Sept. 10, 2021)). Mr. Hughes fails *TransUnion*'s standards.

**B.      Mr. Hughes Does Not Allege a Harm with the Requisite "Close Relationship" to Harms Traditionally Recognized as Providing a Basis for Suit.**

Stripped of legally irrelevant rhetoric, Mr. Hughes's allegations boil down to this: the NFL caused disclosures of true, non-misleading, non-reputationally-damaging information about him

—information he does not allege was ever read by a single human being—to one entity, Facebook—an entity with which Mr. Hughes voluntarily signed up for an account, and which discloses to its account holders—including Mr. Hughes—that it tracks their activity on third party sites and the reasons why. Even if true, that allegation does not bear a passing resemblance, let alone a "close relationship," to harms traditionally recognized as a basis for a lawsuit, nor does it demonstrate any actual harm.

It is not "traditionally recognized" that there is a legally cognizable injury-in-fact whenever one person communicates truthful information about another (with or without consent). On the contrary, it has been "traditionally recognized" that such communication is generally lawful. *Cf. Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (restrictions on "truthful speech" are allowable only in rare circumstances (citation omitted)). Accordingly, under *TransUnion*, Congress could not allow a plaintiff to sue in federal court simply because someone truthfully told a third party— through a mechanism to which he consented, no less—that he watched Giants highlights, without any showing of a concrete injury. *See Maddox*, 19 F.4th at 63 (describing requirement of "close relationship" to harm traditionally recognized as providing a basis for suit).

The closest common-law analogue of Mr. Hughes's claim (though still far too distant under *TransUnion*) would be a suit for public disclosure of private facts. But Mr. Hughes's allegations bear no resemblance to the kind of harms addressed by that tort—which requires "publicity" to the "general public" of "private" facts in a manner "highly offensive to a reasonable person." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245, 1249 (11th Cir. 2022) (en banc). Mr. Hughes's allegations bear no relationship—let alone a "close" one—to any of these elements.[5]

---

[5] Nor do they bear any resemblance to the incident that led to the VPPA's passage: the release to a newspaper of Judge Robert Bork's video rental records, without permission, which were then published to the world. *Cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015).

Most clearly, Mr. Hughes alleges no "publicity," or even that "*any* human being"—as opposed to an "automated system[]"—"ever saw his private information." *Sputz*, 2021 WL 5772033, at *4 (emphasis added). The Eleventh Circuit's recent *en banc* decision in *Hunstein* found that a plaintiff lacked standing to pursue a statutory unlawful-disclosure claim akin to Mr. Hughes's for precisely this reason. As *Hunstein* explains, "publicity" requires communication "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." 48 F.4th at 1245-46 (citation omitted). Thus, allegations of mere *disclosure* of truthful information to one recipient company, as here, are insufficient to create Article III standing. *Id.* at 1245-48. Likewise, the Tenth Circuit recently applied *Hunstein* to reach the same conclusion: a plaintiff lacks standing to pursue a statutory unlawful-disclosure action based on the defendant's mere disclosure of truthful information to one vendor. *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828-29 (10th Cir. 2022). Recent decisions in this District have reached the same conclusion on similar facts. *See, e.g.*, *Glick v. CMRE Fin. Servs., Inc.*, No. 21-cv-7456, 2022 WL 2475690, at *3 (S.D.N.Y. July 6, 2022); *Sputz*, 2021 WL 5772033, at *2-5. Although these cases involved a different statute (the Fair Debt Collection Practices Act), their standing analysis is directly on point and dictates dismissal here.

Mr. Hughes's failure to allege "publicity" is alone fatal to standing, as *Hunstein*, *Shields*, *Glick*, and *Sputz* persuasively explain. But there is at least one additional independently sufficient reason why Mr. Hughes fails to allege a harm with a "close relationship" to a "harm[] traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. As explained above, Mr. Hughes consented to the alleged disclosures through his notice of, and agreement to, Facebook's policies that alerted him to the cookie-based tracking and ad-customization technologies he now complains of. *See supra*, Factual Background, Part B. As Facebook's cookie policy currently states, Facebook "place[s] cookies on your computer or device

**[to] receive information stored in cookies when you use or visit . . . [w]ebsites and apps provided by other companies**." *Cookies Policy*, Facebook.com, https://www.facebook.com/privacy/policies/cookies (eff. Oct. 5, 2022) (emphasis added).[6] And while that *alone* is enough, Mr. Hughes also consented separately through the NFL.com Privacy Policy. *See supra*, Factual Background, Part C.

A disclosure to which an individual consented is *not* a "harm" that is "traditionally recognized" as giving rise to a viable tort suit. On the contrary, consent provides an "absolute privilege" from traditional privacy torts. Restatement (Second) of Torts § 652F cmt. b (Am. Law Inst. Mar. 2023 Update); *see also* David A. Elder, *Privacy Torts* § 3:9 (Dec. 2022 Update); William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 419-20 (1960). Such consent is another independently sufficient basis for demonstrating that Mr. Hughes lacks Article III standing, due to his failure to allege a harm with any relationship, let alone the requisite close relationship, to a harm traditionally recognized as providing a basis for suit in American courts.

> **C.     Mr. Hughes Cannot Rely on Unpersuasive, Superseded, and Non-Binding Authority to Avoid His Duty to Show a Concrete Injury-in-Fact.**

Under *TransUnion* and the post-*TransUnion* consensus reflected in the *Hunstein*, *Shields*, *Glick*, and *Sputz* decisions, Mr. Hughes lacks standing. Nor can Mr. Hughes seek to undermine this analysis by relying on pre-*TransUnion* VPPA cases.[7] Whatever the state of the law may have

---

[6] As noted, when ruling on a motion to dismiss under Rule 12(b)(1), courts may consider information outside the complaint. *See Cortlandt*, 790 F.3d at 417.

[7] *E.g.*, *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016). Some pre-*TransUnion* cases relied on distinctions between "procedural" and "substantive" statutory violations, rooted in a particular interpretation of *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). But, as the Second Circuit held in *Maddox*, *TransUnion* "eliminated" the entire "substantive" vs. "procedural" analytic framework. *Maddox*, 19 F.4th at 64 & n.2. And *Hunstein* effectively overruled the Eleventh Circuit's prior standing analysis in *Perry*.

been prior to *TransUnion*, the Second Circuit has recognized that *TransUnion* represents a significant "change in standing doctrine," which "narrowed the grounds for asserting standing where the injury is primarily statutory." *Faehner*, 2022 WL 500454, at *1; *accord Maddox*, 19 F.4th at 60 (reversing same Second Circuit panel's prior standing analysis in light of *TransUnion*). To the extent pre-*TransUnion* cases have relied on broad analogies between the VPPA and traditional privacy torts—without asking whether the *specific plaintiff at hand* suffered *specific concrete injuries* with a "close relationship" to those redressed by such torts—they are superseded by *TransUnion*. Under *TransUnion*, Mr. Hughes "must show that the [alleged] statutory violation caused" him actual harm, concretely and in fact. *Maddox*, 19 F.4th at 64 & n.2. Mr. Hughes does not—and cannot—satisfy this requirement.

Mr. Hughes may seek support in *Martin v. Meredith Corp.*, No. 22-cv-4776, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023), in which a court rejected a post-*TransUnion* argument that a VPPA plaintiff lacked standing. *Id.* at *2. But *Martin* was addressing an argument the NFL does not make here, namely that standing was absent because "the information disclosed to Facebook does not include information protected by the VPPA." *Id.* at *2 (holding that such an argument improperly conflates standing and merits). *Martin* did not analyze the issue raised here, namely whether the bare allegation of a VPPA violation, without more, bears a sufficiently close relationship to harms that have traditionally been recognized as a basis for suit in American courts to qualify as an intangible injury-in-fact under Article III. Nor did it cite or discuss (or, indeed, evince awareness of) post-*TransUnion* cases like *Shields*, *Hunstein*, *Glick*, and *Sputz*, whose reasoning plainly dictates dismissal here.

*Martin* briefly cited *TransUnion*'s passing reference to "disclosure of private information" to support its holding. 2023 WL 2118074, at *2 (quoting *TransUnion*, 141 S. Ct. at 2204). But as recognized in *Hunstein*, *Shields*, *Glick*, and *Sputz*, *TransUnion* did not say that *any* disclosure of

"private information" creates standing. Rather, the disclosure must cause a harm with a "close relationship" to a harm traditionally recognized as providing a basis for suit in American courts. *See, e.g.*, *Glick*, 2022 WL 2475690, at *3 (quoting same language from *TransUnion* and noting that "publicity" was still needed for standing). In *TransUnion* itself, the relevant harm was the reputational damage of *misleading* disclosures, which are closely analogous to common-law defamation. 141 S. Ct. at 2208-09. Here, the information at issue is *not* misleading or harmful—eliminating any analogy to defamation. Moreover, even if defamation were the proper benchmark, *TransUnion* held that mere disclosure is insufficient to allege an injury-in-fact absent "evidence that the document was actually read," i.e., "brought . . . to the perception" of another human, rather than "merely processed"—allegations missing here. *Id.* at 2210 n.6 (citation omitted).

## II.     Mr. Hughes Fails to Allege Facts to Support a VPPA Claim.

To plead a plausible claim under the VPPA, a plaintiff must allege facts to support that (1) he qualifies as a "consumer" of the defendant "video tape service provider"; (2) the defendant disclosed "personally identifiable information"; and (3) the disclosure was made "knowingly." 18 U.S.C. § 2710; *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Mr. Hughes's complaint fails to state these elements of a VPPA claim, and must accordingly be dismissed.

### A.     Mr. Hughes Fails to Allege Facts that Qualify Him as a VPPA "Consumer."

The VPPA's protections apply only to "consumers," where "consumer" is defined as a "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Mr. Hughes is not a "renter" or "purchaser" of any goods or services from NFL.com, and does not allege otherwise. And while he characterizes himself as a "subscriber," he does not actually subscribe to any video goods or services from NFL.com.[8] His allegations

---

[8] The Complaint includes limited allegations about video content hosted on a mobile application, but Mr. Hughes does not allege he downloaded any such application, or even specify what

consist of asserting that he "open[ed] an account," which involved giving basic information (such as his email address and name), and "sign[ed] up for an online newsletter." Compl. ¶¶ 20, 24. He does not allege the email newsletters he received contained video content or resulted in any disclosures (or, indeed, that he even looked at them). Moreover, he does not allege that he received access to restricted video content (or indeed any content other than the newsletters) by signing up. Indeed, his own example screenshot shows a video being watched by a user *not signed in* to any NFL.com account. *Id.* ¶ 37. Notwithstanding Mr. Hughes's self-assigned "digital subscriber" label, *id.* ¶ 22, these barebones allegations fail to plausibly allege that he was a VPPA "subscriber."

Mr. Hughes does not fit the definition of a "subscriber" of goods or services from NFL.com, as the term "subscriber" is ordinarily understood. 18 U.S.C. § 2710(a). As Judge Buchwald explained in *Austin-Spearman v. AMC Network Entertainment LLC*, a "subscription" to a good or service "entails an exchange between subscriber and provider whereby the subscriber imparts money and/or personal information" to obtain the content at issue. 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015). The Eleventh Circuit reached a similar conclusion in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015). There, the court held that "merely downloading [the provider's] app for free and watching videos at no cost does not make him a 'subscriber.'" *Id.* at 1256. The court explained that the ordinary meaning of "subscription" involves "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Id.* Although the Eleventh Circuit held that "payment" was not a "*necessary* element of subscription," it embraced the view that "[s]ubscriptions involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to

---

application he is referring to. This discussion thus concerns only Mr. Hughes's alleged sign-up for online newsletter communications on NFL.com.

restricted content." *Id.* (emphasis added) (citation and alterations omitted). The court's delimited understanding of the word "subscriber" was appropriate not only because it was grounded in "the ordinary meaning of the term," but because it gave effect to Congress's manifest intent to limit the VPPA's coverage: "Congress could have employed broader terms in defining 'consumer' when it enacted the VPPA (e.g., 'user' or 'viewer') or when it later amended the Act (e.g., 'a visitor of a web site or mobile app'), but it did not." *Id.* at 1256-57.

Such a relationship simply is absent here. Mr. Hughes's sign-up had no relationship to his ability to access the freely available video content at issue, and thus it established no commitment or relationship respecting any of NFL.com's video content. Mr. Hughes may have provided his name and address to the NFL, but he certainly did not do so in exchange for access to any video content, which already was freely accessible to him whether or not he signed up for an account. The Complaint itself makes this clear, as its screenshot shows a user accessing video content without signing in. *See* Compl. ¶ 37 (with screenshot of video page demonstrating that the user has not used the website's "Sign In" function). Moreover, Mr. Hughes was free to unsubscribe from NFL newsletters, or delete any site profile he created, at any time with "zero consequences, costs, or further obligations." *Austin-Spearman*, 98 F. Supp. 3d at 669 (citation omitted). As *Ellis* persuasively reasoned, had Congress intended the VPPA to cover casual consumption of free video content by parties with no meaningful business relationship to the defendant (and none at all related to the video content or disclosures at issue), it would not have carefully restricted the law's application to "renter[s], purchaser[s], or subscriber[s]." 18 U.S.C. § 2710(a)(1). Mr. Hughes's failure to allege any meaningful "ongoing commitment or relationship" with the NFL thus resolves this case under the VPPA's plain text. *Ellis*, 803 F.3d at 1257.[9]

---

[9] Insofar as the Northern District of Georgia suggested otherwise in a recent VPPA decision—in a discussion that did not involve a rigorous analysis of the statute's text, purpose, or history—it was

Mr. Hughes's reliance on his commitment-free and payment-free decision to "register for NFL.com" and "sign up for an online newsletter" (Compl. ¶ 20) to establish "subscriber" status is implausible for another reason. The VPPA applies only to "subscriber[s] of goods or services *from a video tape service provider*." 18 U.S.C. § 2710(a)(1) (emphasis added). Its clear intent is to protect "consumer[s]" of businesses that offer "prerecorded video cassette tapes or similar audio visual materials," and the statute's definition of "personally identifiable information" only includes information that identifies a person as having "requested or obtained specific *video* materials or services." *Id.* § 2710(a)(1), (3), (4) (emphasis added). It follows that the term "subscriber" must rationally be linked to a plaintiff's access to videos and video viewing activity. To hold otherwise would create absurd results, making the VPPA's coverage depend on completely accidental factors unconnected to a plaintiff's consumption of video content. *See Phillips v. Saratoga Harness Racing, Inc.*, 240 F.3d 174, 179 (2d Cir. 2001) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available . . . ." (internal quotation marks omitted)); *accord Austin-Spearman*, 98 F. Supp. 3d at 671 (expressing skepticism that "a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos"). Indeed, it would make little sense to hold that Mr. Hughes is able to assert a VPPA claim based on the minimal relationship he alleges with NFL.com, but a user who accesses the same freely available video content without having "register[ed]" (Compl. ¶ 20) cannot assert a VPPA claim. Because Mr. Hughes alleges *no* connection between his purported "subscriber"

---

incorrect. *See Lebakken v. WebMD, LLC*, No. 22-cv-644, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022).

status and his viewing of free videos on NFL.com, or any alleged disclosures that resulted, Mr.

Hughes has failed to plausibly allege he is a "subscriber" under the VPPA.

**B.      The NFL Did Not "Knowingly Disclose" Any PII.**

       **1.      The Alleged Disclosures of PII Were Made by Mr. Hughes's Device, Not the NFL.**

The text of the statute makes clear that VPPA claims may only be brought against a

defendant "who knowingly discloses" the PII at issue (18 U.S.C. § 2710(b)(1))—i.e., the defendant

must be *the party doing the disclosing*.  Here, Mr. Hughes fails to plausibly allege that the NFL

disclosed his PII.

First, the Complaint itself clarifies that the alleged transfer of PII *is made by* Mr. Hughes's

own browser, not the NFL.  As the Complaint explains, "code from Facebook" causes "the digital

subscriber['s] identity and viewed Video Media to be transmitted to Facebook *by the user's*

*browser*."  Compl. ¶¶ 29, 31 (emphasis added).  The Complaint's own example web session

clarifies the point.  *Id*. ¶¶ 37-38.  Mr. Hughes shows an HTTP request allegedly demonstrating the

disclosure of "the content name of the video" and the FID.  *Id.* ¶ 38.  As the caption explains, this

HTTP request is "sent *from the device* to Facebook," not from the NFL.  *Id.* (emphasis added).  No

other example is given in the Complaint of alleged conduct that violates the VPPA.  Mr. Hughes's

own example shows the complained-of disclosure is made by his device's browser, not the NFL.

*See Mollett*, 795 F.3d at 1066-67 (rejecting VPPA claim where disclosure was controlled by

plaintiff); *cf. Peerless Ins. Co. v. Law Offices of Jason E. Taylor P.C.*, No. 19-cv-126, 2020 WL

4370941, at *3 (W.D.N.C. July 8, 2020) ("[I]t would be impossible to disclose information without

sending, transmitting, communicating, or distributing it." (internal quotation marks omitted)),

*memorandum and recommendation adopted*, 2020 WL 4369446 (W.D.N.C. July 30, 2020).

Second, as also made clear by the Complaint, the NFL never has access to a user's FID,

and thus cannot have disclosed it to Facebook. To qualify as "PII" under the statute, information must include "[1] the consumer's identity; [2] the video material's identity; and [3] the connection between them." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095-96 (N.D. Cal. 2015). Here, the alleged personal identifier—the piece of information that actually identified Mr. Hughes to Facebook—is Mr. Hughes's FID. *See* Compl. ¶¶ 4-5, 31-32, 38. But the only source of FID information about a user alleged in the Complaint is "one or more personally identifiable FID cookies *on [the user's] browser*." *Id.* ¶ 31 (emphasis added); *see supra,* Factual Background, Part B. This information only exists on a user's browser, where it is placed *by Facebook* when the user logs into Facebook, and is not transmitted to or collected by the NFL's website. *See* Compl. ¶ 12 ("During the relevant time period [Mr. Hughes] has used his NFL.com digital subscription to view Video Media through NFL.com and/or App [sic] *while logged into his Facebook account*." (emphasis added)). Nowhere does the Complaint allege that Mr. Hughes provided an FID to the NFL. And the NFL cannot disclose what it does not possess. *Cf. Chutich v. Green Tree Acceptance, Inc.*, No. 88-cv-869, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[I]t is axiomatic that a corporation cannot disclose what it does not know . . . .").[10]

At most, Mr. Hughes alleges that the NFL *caused* his browser to make a disclosure of PII. But the statute imposes liability only on a party that "discloses" PII, not a party that merely "causes" a disclosure of information it does not possess by some other person or entity, or between

---

[10] The reasoning in *Czarnionka v. Epoch Times Association, Inc.*, No. 22-cv-6348, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022), is not persuasive and does not change this conclusion. There, a court reasoned that the defendant, by using the Facebook pixel, had "opened a digital door and invited Facebook" to enter that door and acquire the user's PII. *Id.* But the VPPA imposes liability on a party that *discloses* PII, not a party that allegedly *causes* a disclosure. And, contrary to *Czarnionka*'s reasoning, a defendant's use of the Facebook pixel is not analogous to "[t]hrowing Judge Bork's video watch list in the recycle bin . . . knowing that the Washington Post searches your bin every evening." *Id.* (citation omitted). Such an analogy assumes the NFL possessed the relevant PII—necessarily, including Mr. Hughes's FID—which it did not.

other parties who separately have a business relationship. If Congress had wanted to extend VPPA liability to those who merely *cause* a disclosure, it could have crafted the statute that way. Indeed, it has done so before. *See, e.g.*, 15 U.S.C. § 6821 (prohibiting any person to "*cause to be disclosed . . .* customer information of a financial institution" (emphasis added)); 18 U.S.C. App. 3 § 5 ("defendant reasonably expects to disclose *or to cause the disclosure* of classified information" (emphasis added)); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, *or to cause the disclosure of*, classified information" (emphasis added)). Congress thus "knew how" to "impose . . . liability" for *causing* a disclosure "when it chose to do so." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). And it could have done so in the VPPA if it wished. "But it did not." *Id.* at 177. Theories that a defendant's acts led to, or caused, a PII disclosure *by someone else* thus cannot state a VPPA claim. Yet that is all Mr. Hughes alleges.

### 2. The NFL Did Not "Knowingly" Disclose PII.

Even if the NFL disclosed PII to Facebook (which it did not), such a disclosure was not done "knowingly." To violate the VPPA, a defendant must "knowingly disclose[]" PII. 18 U.S.C. § 2710(b)(1). As explained in *In re Hulu Privacy Litigation*, "'knowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." 86 F. Supp. 3d at 1095. Therefore, "[i]f [defendant] did not know that it was transmitting both an identifier and the person's video watching information, then there is no violation of the VPPA." *In re Hulu Priv. Litig.*, No. 11-cv-03764, 2014 WL 1724344, at *15 (N.D. Cal. Apr. 28, 2014).

Here, the Complaint alleges that the NFL's knowledge is evidenced by "the functionality of the pixel." Compl. ¶ 33. But while Facebook (and apparently Mr. Hughes) may know what data is contained in the "c_user" cookie, nothing is alleged to suggest that *the NFL* has knowledge of what was contained there, let alone that the NFL was capable of accessing it. Thus, even if the disclosure by Mr. Hughes's browser could be "attributed" to the NFL based on Mr. Hughes's mere

assertion that the NFL *caused* it, that still falls short of alleging a "knowing disclosure" by the NFL where the NFL is not privy to and has no access to the PII being disclosed. As discussed, the NFL did not receive, collect or store FIDs, and did not transmit any PII. *See supra,* Section II.B.1.

The Complaint fails to allege a knowing disclosure by the NFL for an additional reason: in connection with any alleged disclosure that occurred, Mr. Hughes does not allege that the NFL had knowledge that the user had a Facebook account, had a Facebook cookie installed on their browser, or had logged in to Facebook when they browsed on NFL.com. The bare allegation that the NFL knows the end result of the Facebook Pixel's operation (i.e., the ability to target advertising) cannot suffice to show that the NFL knowingly disclosed PII in any instance.

## III. The Court Should Dismiss the Complaint's Class Allegations.

Even if the Court declines to dismiss the Complaint in its entirety, it should nevertheless dismiss the class claims with prejudice. Mr. Hughes consented to the NFL's Terms and Conditions, *see supra,* Factual Background, Part C, which provide that the claims he now asserts must be pursued exclusively on an individual basis. Notably, under well-established Second Circuit precedent, the NFL's sign-up page gives "reasonably conspicuous" notice of these terms, *see* Preston Decl. ¶ 4, Ex. B, and Factual Background, Part C—and a user's decision to press forward in the face of this notice is an "unambiguous" "manifestation of assent" "as a matter of law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76-80 (2d Cir. 2017). Mr. Hughes himself refers to the NFL's Terms in his Complaint, *see* Compl. ¶ 27 (second paragraph labeled "27"), and nowhere disputes that he received notice of them before "register[ing] for NFL.com," *id.* ¶ 20.

A "complete, clear, and unambiguous" contractual provision "must be enforced according to the plain meaning of its terms." *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d. Cir. 2019) (citation and alterations omitted). That includes class action waivers. *See, e.g.*, *Horton v. Dow Jones & Co.*, 804 F. App'x 81, 84 (2d Cir. 2020) (summary

order). The waiver found in the NFL's Terms and Conditions is unambiguous. The Terms and Conditions state in all caps "THIS AGREEMENT CONTAINS . . . [A] CLASS ACTION WAIVER." Preston Decl. ¶ 5, Ex. C at 1. The Terms and Conditions refer in a heading to "Class Action Waiver," and that waiver provides that the parties agree that:

> ANY PROCEEDINGS TO RESOLVE OR LITIGATE ANY DISPUTE WILL BE CONDUCTED SOLELY ON AN INDIVIDUAL BASIS. NEITHER YOU NOR THE NFL WILL SEEK TO HAVE ANY DISPUTE HEARD AS A CLASS ACTION OR IN ANY OTHER PROCEEDING IN WHICH EITHER PARTY ACTS OR PROPOSES TO ACT IN A REPRESENTATIVE CAPACITY.

*Id.* at 18. Courts frequently uphold class action waiver provisions employing similar language. *See, e.g.*, *Horton*, 804 F. App'x at 84 (2d Cir. 2020) (upholding waiver in which plaintiff agreed that "class arbitrations and class actions are not permitted and, by entering into this Agreement, you are giving up the ability to participate in a class action"); *U1it4Less, Inc. v. FedEx Corp.*, No. 11-cv-1713, 2015 WL 3916247, at *1, *6 (S.D.N.Y. June 25, 2015) (upholding class action waiver in which Plaintiff agreed not to sue "as a class plaintiff or class representative" or "participate as an adverse party in any way in a class action lawsuit"); *see also Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1309, 1315 (S.D. Fla. 2020) (upholding class action waiver in which plaintiff agreed that any case brought under the operative contract "must be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding"), *aff'd*, No. 20-13699, 2021 WL 4317318 (11th Cir. Sept. 23, 2021) (per curiam).

One court in this District has held that "principles of contract law strongly support enforceability" of class action waivers unless (1) "the class action waiver at issue is unconscionable under the applicable state law"; or (2) "the statutory scheme . . . suggests legislative intent or policy reasons weighing against enforcement of such a waiver." *U1it4Less*, 2015 WL 3916247, at *4. Neither exception is present in this case and therefore the NFL's class action waiver should be enforced. Courts have held that "[u]nder New York law, . . . 'a contractual proscription against

class actions is neither unconscionable nor violative of public policy.'" *Horton*, 804 F. App'x at 84 (quoting *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (1st Dep't 2004)). Moreover, nothing about the VPPA's statutory scheme weighs against enforcement of a class action waiver. There are no provisions within the VPPA that contemplate a congressional command in favor of class action lawsuits. *See* 18 U.S.C. § 2710. Nor does case law decided under the VPPA suggest any such a command. *See T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-cv-7915, 2022 WL 888943, at *13 (N.D. Ill. Mar. 25, 2022) (granting final approval of a class action settlement of VPPA claims and state law claims and stating, in *dicta*, that a class would "likely have little success challenging the arbitration and class action agreement, given the strong presumption in favor of enforceability"), *appeal dismissed*, No. 22-1686 (7th Cir. Aug. 22, 2022). Mr. Hughes consented to the NFL's unambiguous and enforceable class action waiver; the Court should dismiss Mr. Hughes's class claims with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: March 2, 2023

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

By: */s/ Hilary L. Preston*

Hilary L. Preston
Marisa Antonelli
1114 Avenue of Americas
32nd Floor
New York, NY 10036
Telephone: (212) 237-0000
Facsimile: (212) 237-0100
hpreston@velaw.com
mantonelli@velaw.com

*Counsel for National Football League*