## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

BRANDON HUGHES, individually and on
behalf of all others similarly situated,

     Plaintiff,

v.

NATIONAL FOOTBALL LEAUGE,

     Defendant.

Case No. 1:22-cv-10743-JLR

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## (FILED IN RESPONSE TO ECF NOS. 44-46)

# TABLE OF CONTENTS

Introduction.................................................................................................................1

Argument ....................................................................................................................3

   A.  Mr. Hughes has Article III standing. ...............................................................3

      Concrete. .....................................................................................................4

      Traceable......................................................................................................8

   B.  Plaintiff has plausibly plead his VPPA claim.................................................9

      1.  Mr. Hughes has plausibly plead that he is a "consumer" of a "good or service" under the VPPA. ........................................................9

      2.  Plaintiff has plead a knowing disclosure of PII. ...........................11

         a.  The NFL knowingly held the door open for Facebook to walk in and access Mr. Hughes's PII...............................................11

         b.  The Facebook ID – on its own – constitutes PII. ....................12

   C.  Defendant's class action waiver is intertwined with the arbitration clause it has chosen not to enforce in this matter.........................................13

Conclusion ................................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Ambrose v. Boston Globe Media Partners LLC* ("*Boston Globe*"),
   No. 21-cv-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022)....................1, 9, 10-12

*Belozerov v. Gannett Co.* ("*Gannett*"),
   No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) .............................1, 9, 11-12

*Boelter v. Advance Magazine Publishers Inc.*,
   201 F. Supp. 3d 579, 587-90 (S.D.N.Y. 2016) ...................................................................7 n.4

*Braitberg v. Charter Commc'ns, Inc.*,
   836 F.3d 925, 930-31 (8th Cir. 2016) ................................................................................. 4-7

*Czarnionka v. The Epoch Times Ass'n, Inc.* ("*Epoch Times*"),
   No. 22-cv-6348, 2022 WL 170698102 (S.D.N.Y. Nov. 17, 2022) .........................1, 9, 11-12

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) ..........................................................................................3 n.2, 7

*Feldman v. Star Trib. Media Co.* ("*Star Trib.*"),
   No. 22-cv-1731, 2023 WL 2388381 (D. Minn. Mar. 7, 2023) ..................................1, 4-5, 7-8

*Fischer v. Instant Checkmate LLC*, No. 19-cv-4892,
   2022 WL 971479 (N.D. Ill. Mar. 31, 2022)..................................................................... 14-16

*Glick v. CMRE Fin. Servs., Inc.*,
   No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022).............................................. 5-6

*Goldstein v. Fandango Media, LLC*,
   No. 22-cv-80569, ECF No. 57 (S.D. Fla. Mar. 7, 2023) ...........................................................1

*Harris v. Public Broadcasting Serv.* ("*PBS*"),
   No. 1:22-cv-2456, 2023 WL 2583118 (N.D. Ga. Mar. 20, 2023) ...................................... 9-12

*Horton v. Dow Jones & Co., Inc.*,
   804 F. App'x 81, 83 (2d Cir. 2020) ................................................................................. 16-17

*Hunstein v. Preferred Collection & Mgmt. Servs.*,
   48 F.4th 1236 (11th Cir. 2022) ...............................................................................................6

*In re Nickelodeon Consumer Priv. Litig.*,
   827 F.3d 262 (3d Cir. 2016)..........................................................................................3 n.2, 7

*Krassick v. Archaelogical Inst. of Am.*,
    No. 2:21-cv-180, 2022 WL 2071730, at *2 (W.D. Mich. June 9, 2022) ............................7 n.4

*Lebakken v. WebMD, LLC* ("*WebMD*"),
    No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022) ..................................... 1, 9-10, 12

*Louth v. NFL Enters. LLC*,
    No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) ...................................................1

*Martin v. Meredith Corp.* ("*Meredith*"),
    No. 22-cv-4776, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) ................................... 1-2, 4, 8

*Meyer v. Kalanick*,
    185 F. Supp. 3d 448, 453 (S.D.N.Y. 2016)....................................................................... 14-15

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ...................................................................................3 n.2, 7

*Pratt v. KSE Sportsman Media, Inc.*,
    586 F. Supp. 3d 666 (E.D. Mich. 2022)...........................................................................7 n.4

*Roman v. Spirit Airlines, Inc.*,
    482 F. Supp. 3d 1304, 1309 (S.D. Fla. 2020),
    *aff'd*, No. 20-13699, 2021 WL 4317318 (11th Cir. Sept. 23, 2021).....................................17

*Shields v. Pro Bureau of Collections of Md., Inc.*,
    55 F.4th 823 (10th Cir. 2022) .............................................................................................6

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................................................4,7

*Sputz v. Alltran Fin., LP*,
    No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ............................................ 5-6

*Stark v. Patreon, Inc.* ("*Patreon*"),
    No. 22-cv-3131, 2023 WL 2090979 (N.D. Cal. Feb. 17, 2023) .........................................9, 12

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618, 623 (7th Cir. 2014) .................................................................................3 n.2

*TransUnion v. Ramrirez*,
    141 S. Ct. 2190 (2021)................................................................................................. 3-5, 7

*U1it4Less, Inc. v. FedEx Corp.*,
    No. 11-CV-1713 KBF, 2015 WL 3916247 (S.D.N.Y. June 25, 2015)....................................17

*Vine v. PLS Fin. Servs., Inc.*,
807 F. App'x 320, 328 (5th Cir. 2020) ....................................................................15

**<u>Statutes</u>**

18 U.S.C. § 2710(a)(1)............................................................................................9

**<u>Other</u>**

*Martin v. Meredith Corp.*, No. 1-22-cv-4776-DLC (S.D.N.Y.), Mem. of
Law in Support of Defs.' Mot. to Dismiss, ECF No. 37 (Sept. 16, 2022).....................................8

**INTRODUCTION**

Quite simply, "[t]he VPPA prohibits video tape service providers from knowingly disclosing 'personally identifiable information concerning any consumer of such provider[.]" *Czarnionka v. The Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, at *2 (S.D.N.Y. Nov. 17, 2022). "To state a claim under the VPPA, 'a plaintiff must allege that '[a] video tape service provider . . . knowingly disclose[d], to any person, personally identifiable information concerning any consumer of such provider.'" *Ambrose v. Boston Globe Media Partners LLC*, No. 21-cv-10810-RGS, 2022 WL 4329373, *2 (D. Mass. Sept. 19, 2022) (citation omitted).

To date, there is a nearly unbroken string of plaintiffs defeating motions to dismiss based on allegations materially identical the ones pursued here. *See Harris v. Public Broadcasting Serv.*, No. 1:22-cv-2456, 2023 WL 2583118 (N.D. Ga. Mar. 20, 2023); *Goldstein v. Fandango Media, LLC*, No. 22-cv-80569, ECF No. 57 (S.D. Fla. Mar. 7, 2023); *Feldman v. Star Trib. Media Co.*, No. 22-cv-1731, 2023 WL 2388381 (D. Minn. Mar. 7, 2023); *Belozerov v. Gannett Co.*, No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022); *Epoch Times*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD*, LLC, No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022); *Boston Globe*, 2022 WL 4329373. *See also Louth v. NFL Enters. LLC*, No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) (Google Pixel). *Contra Martin v. Meredith Corp.*, No. 22-cv-4776, 2023 WL 2118074, *2 (S.D.N.Y. Feb. 17, 2023). Yet, the NFL has chosen to largely ignore these recent decisions (citing only *Epoch Times, Meredith,* and *WebMD*). Rather than grapple with this ever-expanding body of case law, Defendant instead has chosen to rely on inapplicable and outdated caselaw, seek inferences to be drawn in its favor, and overlook Plaintiff's well-pleaded allegations.

As discussed in greater detail below, these courts have consistently found that:

- The plaintiffs have Article III standing to pursue their VPPA claims based on the defendants' disclosures.

- The plaintiffs are plausibly "consumers" under the VPPA.

- The defendants are plausibly "video tape service providers" under the VPPA.

- The newsletter that plaintiffs subscribe to is plausibly a "good or service" under the VPPA.

- The Facebook ID plausibly constitutes "personally identifiable information" under the VPPA.

- The defendants plausibly communicated the plaintiffs' PII to Facebook "knowingly" in violation of the VPPA.

With respect to the lone exception, *Meredith*, the court dismissed the VPPA claim because, unlike here, the plaintiff failed to plead that the name of the video was transmitted. 2023 WL 2118074, at *3-4. But the *Meredith* court, without much difficulty, also found that plaintiff's "allegations that the defendants disclosed his private information to a third party without his consent are sufficient to confer standing" to pursue a VPPA claim. Id., at *2.

Defendant National Football League ("NFL") is a professional sports league that boasts approximately 26 million unique monthly visitors to its website www.nfl.com. Compl. ¶ 13, ECF No. 59.[1] On its website, the NFL chose to enable a tracking product developed by Meta Platforms Inc. (f/k/a Facebook Inc.), called "the Pixel," to be freely installed on its users' browsers. The Pixel is a small bit of computer code that collected and disclosed to Meta personally identifiable information about the subscribers using NFL's website and the actions that they take on it. Among other things, the Pixel transmits the titles of videos users request or obtain, together with the viewer's "Facebook ID," a unique identifier anyone can use to look up the viewer's Facebook profile, which contains detailed information about the subscriber.

---

[1] Citations to ¶ ___ are to the Corrected First Amended Class Action Complaint, ECF No. 59.

Just as the plaintiffs in the cases cited above did, here Mr. Hughes has plausibly plead the following:

- Plaintiff Brandon Hughes was a NFL newsletter subscriber and, during that time, was also a Facebook user. ¶¶ 12, 46.

- Whenever he watched a video on NFL.com, the NFL transmitted to Facebook via the Pixel the video's title and Mr. Hughes's Facebook ID. ¶¶ 1, 4-6, 8, 12, 19, 28, 31-41.

- The NFL is a "video tape service provider." ¶¶ 2, 13, 58.

- The NFL "knowingly disclosed" Mr. Hughes's "personal identifiable information" by installing the Facebook Pixel on its website and allowing the Facebook Pixel to capture and share Mr. Hughes's personally identifiable information with third parties. *id.*, ¶¶ 2-4, 19, 32, 39, 41, 46, 60, 62.

- Mr. Hughes is a "consumer" of a "good of service." ¶¶ 20, 46-47, 63.

There is nothing in the NFL's motion to dismiss alters these allegations. As such, Defendant's motion must be denied in full so that the parties can begin discovery in earnest.

ARGUMENT

**A.    Mr. Hughes has Article III standing.**

In arguing that Mr. Hughes lacks Article III standing, Defendant relies on a stretched-too-thin interpretation of *TransUnion,* 141 S. Ct. 2190 (2021).

While courts have long found the alleged harms under the VPPA to be "concrete,"[2] the NFL argues that since the Supreme Court's ruling in *TransUnion v. Ramirez* somehow reduced

---

[2] *See*, *e.g.*, *In re: Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016) ("While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information."); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) (finding that disclosure of video viewing history was a concrete injury for Article III's purposes); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982-84 (9th Cir. 2017) (determining that the VPPA "protects concrete interests" in privacy that are injured by disclosure and confirming this understanding by reviewing the historical practice and common law tradition regarding privacy-related torts); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1339-41 (11th Cir. 2017) (concluding that the plaintiff "established his standing to file this action because his alleged injury is sufficiently concrete," and that "the VPPA's creation of a cause of action for this type of invasion of privacy 'has a close relationship to a harm that

the types of harm alleged here into something less. Defendant's argument fails for any number of apt football metaphors that plaintiff refrains from inserting into his opposition brief. In *Feldman v. Star Tribune Media Co.*, No. 22-cv-1731, 2023 WL 2388381 (D. Minn. Mar. 7, 2023), the first court to fully wade into the "sensible-but-unconvincing arguments" that defendants raise when reflexively invoking *TransUnion*, the court found plaintiff's VPPA allegations (like those here) to be both "concrete" and "traceable."[3] *Id.* at *4, *7. Defendant here makes the same unconvincing arguments and this Court, in turn, should reject them.

**Concrete**. With respect to the concreteness of plaintiff's harm, in light of *TransUnion*, the *Star Tribune* court stated its task was "to examine the plaintiff's injury allegations and determine whether they have a 'close relationship' to a harm traditionally recognized as the basis for a case under the common law. *Id.* at *4 (citing *Spokeo*, 578 U.S. at 341; *see also Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930-31 (8th Cir. 2016)). In fulfilling its task, the court noted: "Mr. Feldman alleges that his video viewing history was his private concern, the Star Tribune intruded by sharing this history with Facebook, and that this sharing would be offensive to a reasonable person. That seems enough at the motion-to-dismiss stage." *Id.* at *4. The court

---

has traditionally been regarded as providing a basis for a lawsuit in English or American courts'" (quoting *Spokeo*, 578 U.S. at 341)).

[3] The court in *Martin v. Meredith Corp.*, No. 22-cv-4776, 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023) (Cote, J.), found that plaintiff's "allegations that the defendants disclosed his private information to a third party without his consent are sufficient to confer standing." *Id.* at *2. While the *Meredith* court dismissed Martin's VPPA claim, the allegations in that complaint are readily distinguishable from the ones here as it alleged only that "[s]imply sending a URL of a People.com webpage which may or may not include a video does not show that a person requested or obtained specific video materials or services." *Meredith*, 2023 WL 2118074, at *4. Here, Mr. Hughes specifically alleges that "NFL sends to Facebook the video content name, its URL, and, most notably the viewers' Facebook ID." ¶ 30. A more detailed screen capture of the video exhibits in paragraph 37 of the First Amended Complaint (ECF No. 40), demonstrates that the URL contains the word "video" and that the "ViewContent" Pixel fires in addition to simply the "PageView" Pixel, is attached hereto as **Exhibit A**. Compare ¶ 39 & Ex. A hereto with *Meredith*.

went on to note that its "conclusion that a plaintiff like Mr. Feldman has suffered a concrete injury for purposes of Article III standing to assert a VPPA claim is supported by every federal circuit court that has considered the issue." *Id*. at *5. Here, Plaintiff has made the same allegations against the NFL. ¶¶ 29; 37; 41.

The court then turned its attention to defendant's four "sensible-but-unconvincing arguments to show that Mr. Feldman has not alleged a concrete injury." *Id*. at *5. The NFL, in turn, makes the same arguments here and they should fare no better. While the NFL carves up the arguments in a slightly different manner, for all intents and purposes it is making the same arguments the *Star Tribune* court rejected.

*First*, with little effort, the court swept aside defendant's argument that there had been no "public disclosure" by noting that "under the common law tradition associated with invasion-of-privacy and intrusion-upon-seclusion claims, 'publication' of a private matter is not an essential element." *Id*. at *5. Here, Defendant similarly attempts to minimize the disclosures here as merely "non-public disclosures of his NFL.com browsing activity to Facebook." ECF No 46, at 2, 12-14. The NFL's FDCPA-centric arguments should be rejected here.

The two cases Defendant cites from this district dismissing claims post-*TransUnion* are readily distinguishable and in fact demonstrate why Plaintiff here has Article III standing. Both *Glick v. CMRE Fin. Servs., Inc.,* No. 21-cv-7456, 2022 WL 2475690 (S.D.N.Y. July 6, 2022); and *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) involved FDCPA claims premised on defendants' sharing of plaintiffs' debt information with, respectively, a third-party vendor and outside commercial mail house in the process of collecting the debts. Those courts found that the allegations simply did not give rise to the kind of harm against which the invasion of privacy tort protects, given that plaintiffs did not allege that anyone

disclosed their information. *See Glick*, 2022 WL 2475690, at *3; *Sputz*, 2021 WL 5772033, at *5. Likewise, the Tenth Circuit's decision in *Shields v. Pro Bureau of Collections of Md., Inc.*, 55 F.4th 823 (10th Cir. 2022), and the Eleventh Circuit's decision in *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236 (11th Cir. 2022), two more FDCPA cases, involved the same facts – the hiring of a commercial mail vendor by a debt collector – and are likewise distinguishable.

*Second*, the court gave short shrift to defendant's argument the plaintiff did not allege that the disclosed information was "seen by *anybody* at *Facebook*." *Id*. at *5. The court responded: "True, but I understand the common law tradition to care about the offensive intrusion, not whether the intrusion was accompanied by review or perhaps use by a third party. No authority has been cited or identified suggesting that this understanding is incorrect." *Id*. at *5. Here, the NFL argues plaintiff does not allege that the NFL's disclosures were "ever read by a single human being." ECF No. 46, at 11-12. As noted in *Feldman*, this is irrelevant.

*Third*, the court then addressed defendant's argument that "there is there is nothing inherently sensitive, outrageous, or embarrassing about a third party learning that one watches videos on the website of a mainstream local news outlet." *Id*. at *5. The court noted, in light of "the reasons Congress provided for the VPPA," plaintiff's "allegation that he had a privacy interest in his video viewing history, the intrusion of which would be highly offensive to a reasonable person, seems plausible." *Id*. at *5. Here, the NFL argues that it disclosed only "non-reputationally-damaging information about him" that amount to little more than "Giants highlights." ECF No. 46, at 11-12. This is a red herring in light of Plaintiff's allegations of the *private* and *sensitive* nature of the data that was shared with Facebook. ¶¶ 8, 29; 37, 41, 42, 49.

*Fourth*, and finally, the court addressed defendant's assertion that the circuit court decisions are merely "'pre-*TransUnion* outliers' that should not be followed." *Id.* at *5. In rejecting this argument, the court forcefully stated:

> I disagree. *Ramirez* did not overrule or abrogate any part of *Spokeo*. After *Ramirez*, there may be room for argument around precisely how the inferior federal courts are to determine whether a federal statutory claim bears "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341. (For one example of this debate, *see Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) (*en banc*)). But this case does not implicate such arguments. Considering the Eighth Circuit's recognition of the "common law tradition of lawsuits for invasion of privacy," *Braitberg*, 836 F.3d at 930, and the evidently close relationship between Feldman's VPPA claim in this case and the intrusion-upon-seclusion tort as it has been traditionally understood, Mr. Feldman has done enough. The uniformity with which the circuits have decided this issue just reinforces this conclusion.

*Id.* at *5. Here, the NFL attempts to diminish the relevance of *Eichenberger*, *Perry*, and *In re Nickelodeon* by arguing that proclaiming that any pre-*TransUnion* cases have lost their vitality. ECF No. 46, at 14-15 & 14 n.4. As *Star Tribune* makes clear, this is hardly the case.[4]

When faced with a post-*TransUnion* case finding Article III standing in this context under the VPPA, the NFL simply declares that:

> *Martin* was addressing an argument the NFL does not make here, namely that standing was absent because "the information disclosed to Facebook does not include information protected by the VPPA." *Id.* at *2 (holding that such an argument improperly conflates standing and merits). *Martin* did not analyze the issue raised here, namely whether the bare allegation of a VPPA violation, without more, bears a sufficiently close relationship to harms that have traditionally been recognized as a basis for suit in American courts to qualify as an intangible injury-in-fact under Article III.

---

[4] Prior to the issuance of *Star Tribune*, the only decisions fully analyzing standing for analogous allegations were federal district courts interpreting the Michigan Preservation of Personal Privacy Act. *See, e.g., Krassick v. Archaelogical Inst. of Am.*, No. 2:21-cv-180, 2022 WL 2071730, at *2 (W.D. Mich. June 9, 2022); *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022); *Boelter v. Advance Magazine Publishers Inc.*, 201 F. Supp. 3d 579, 587-90 (S.D.N.Y. 2016). These opinions are still persuasive in addressing Defendant's arguments.

ECF No. 46, at 15. The basis for this statement is a bit murky as it appears the *Meredith* defendant presented these arguments to Judge Cote in their motion to dismiss. *See Martin v. Meredith Corp.*, No. 1-22-cv-4776-DLC (S.D.N.Y.), Mem. of Law in Support of Defs.' Mot. to Dismiss, ECF No. 37 (Sept. 16, 2022). For example, defendants in *Meredith* argued that "Plaintiff's VPPA claim fails because the alleged disclosure to Facebook does not satisfy the statutory definition of PII." *Id*. at 14. Likewise, defendants pressed the issue that plaintiff's intangible harms can be concrete if they are ones "'with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.'" *Id*. at 10. Thus, while *Meredith* contains little discussion about how it derived at its conclusion that "plaintiff has sufficiently alleged standing," 2023 WL 2118074, at *2, it's not because the defendants failed to present a full panoply of arguments to the court.

**Traceable**. With respect to the traceability of plaintiff's harm to his allegations, the court turned to defendant's argument "the Star Tribune's use of Facebook Pixel is not what caused Plaintiff's data to be disclosed to Facebook. To the contrary, information is sent to Facebook only because of any one of several actions (or nonactions) taken by the user." *Id*. at *6. The court found traceability was present – or "not absent" – because plaintiff "alleged a direct causal connection between the Star Tribune's conduct and his injury under the VPPA." Id. at *7.

Here, Defendant does not seem to press "traceability," instead arguing it was "Mr. Hughes's device, not the NFL" that caused the disclosure under the 12(b)(6) portion of its motion to dismiss. ECF No. 46, at 20-22. This argument is addressed in Section B.2.a *infra*. To be certain, however, Mr. Hughes has alleged that the NFL directly caused his injuries under the VPPA. ¶¶ 33, 53, 62.

Thus, Mr. Hughes has Article III standing to pursue his VPPA claim.

**B.**     **Plaintiff has plausibly plead his VPPA claim.**

      **1.**     **Mr. Hughes has plausibly plead that he is a "consumer" of a "good or service" under the VPPA.**

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). As noted above, Mr. Hughes has plead both that he is a "consumer," ¶¶ 20, 46-47, 63, and that the NFL is a "video service provider." ¶¶ 2, 13, 58. The NFL attempts to evade this language by arguing that while Mr. Hughes "characterizes himself as a 'subscriber,' he does not actually subscribe to any video goods or services from NFL.com." ECF No. 46, at 16. This argument, as discussed below, has been expressly rejected by the ever-growing line of Pixel-related VPPA cases. *See*, *e.g.*, *PBS*, 2023 WL 2583118, at *3; *Gannett*, 2022 WL 17832185, at *3; *WebMD*, 2022 16716151, at *3; *Boston Globe*, 2022 WL 4329373, at *2.

Rather than arguing it is not a "video service provider" under the VPPA,[5] an argument that's been uniformly rejected,[6] it chooses to argue that Mr. Hughes is not a "subscriber" of "any video goods or services." ECF No. 46, at 16. The *WebMD* court expressly rejected this very argument:

> The Court agrees with [plaintiff] on this point. To constitute a "consumer" under the VPPA, the plaintiff must subscribe to "goods Or services from a video tape service provider," not a video service as WebMD attempts to frame the issue. Thus,

---

[5] In *WebMD*, the court noted that defendant's references to the VPPA legislative history were sufficient to "suggest that it believes it is not a video tape service provider, as contemplated by the VPPA." 2022 16716151, *3 n.3. Notwithstanding this argument by implication, the court found that the plaintiff "adequately alleged that WebMD is a video tape service provider because she alleges that WebMD is engaged in the business of delivering prerecorded audio-visual materials to consumers via its e-newsletter and its website." *Id*. (citation omitted). The same holds true here. ¶¶ 2, 13, 58.

[6] *See Gannett*, No. 22-cv10838, 2022 WL 17832185, at *3; *Patreon,* 2022 WL 7652166, at *8; *Epoch Times*, 2022 WL 17069810, at *4; *WebMD*, 2022 16716151, at *3; *Boston Globe*, 2022 WL 4329373, at *2.

> the question here is whether WebMD's e-newsletter constitutes a good or service of a video tape service provider.

*WebMD*, 2022 16716151, *3 (record citations omitted). The *WebMD* court went on to conclude that plaintiff has "plausibly pleaded that WebMD's e-newsletter constitutes a good or service under the VPPA." *Id*. Defendant relegates *WebMD* to a footnote and notes only that it "did not involve a rigorous analysis of the statute's text, purpose, or history." ECF No. 46, at 18 n.9. Defendant ignores the other recent Pixel-related decisions and instead focuses its efforts on years-old cases that are distinguishable from the facts of this matter and relies on recently-rejected arguments. ECF No. 46, at 17-18.

For example, the NFL relies heavily on *Austin-Spearman*, for the proposition that Plaintiff "does not allege the email newsletters he received contained video content or resulted in any disclosures (or, indeed, that he even looked at them)." ECF No. 46, at 17. This is the identical argument the *WebMD* court rejected:

> WebMD essentially argues that Lebakken providing her email address to WebMD to subscribe to the e-newsletter in 2017 is too attenuated from her viewing of any WebMD videos to state claim under the VPPA. Specifically, WebMD argues that although the First Amended Complaint alleges that WebMD "frequently features its video content through its email newsletter," Lebakken never actually alleges that she ever accessed any of the videos featured in the e-newsletter. *The question here, however, is not whether Lebakken alleges that she viewed the videos embedded within the e-newsletter but rather whether the e-newsletter constitutes a good or service to which Lebakken subscribed.*

*WebMD*, 2022 16716151, *3 (emphasis added) (internal citations omitted). Mr. Hughes is positioned identically to the *WebMD plaintiff. See* ¶¶ 13, 20, 46-47, 58, 63. *See also*, *e.g., PBS*, 2023 WL 2583118, at *4; *Boston Globe*, 2022 WL 4329373, at *2. Mr. Hughes has adequately plead he is a consumer.

**2.      Plaintiff has plead a knowing disclosure of PII.**

      **a.      The NFL knowingly held the door open for Facebook to walk in and access Mr. Hughes's PII.**

The NFL next argues that "the alleged transfer of PII is made by Mr. Hughes's own browser, not the NFL" ECF No. 46, at 20. This argument improperly disregards the Plaintiff's pleading, the requirement that inferences therefrom be drawn in Plaintiff's favor, and attempts to raise merits arguments at the pleading stage. As the Complaint makes clear, ¶¶ 4, 32, 62, 66, and the *Epoch Times* court makes plain, "[b]y installing the Pixel, Defendants opened a digital door and invited Facebook to enter that door and extract information within. *Epoch Times*, 2022 WL 17069810, at *3 (citation omitted). The other courts to address this issue have been similarly unimpressed with this argument. *See PBS*, 2023 WL 2583118, at *6-7; *Gannett*, No. 22-cv10838, 2022 WL 17832185, at *3; *Epoch Times*, 2022 WL 17069810, at *4; *Boston Globe*, 2022 WL 4329373, at *2.

Additionally, it is implausible that NFL – a sophisticated multibillion-dollar enterprise – did not know how the Pixel operated when installing it on its website. Plaintiff has plead as much. ¶¶ 4-5, 13, 19, 30-32, 34-35, 41, 43-45, 48, 62. However, the NFL invites the Court to assume that it has no idea what it installs on its website or how it works. ECF No. 46, at 22-23. Even if that assumption were not directly contradicted by the Complaint's well-pleaded allegations, it would amount to no more than speculation in the NFL's favor untethered from all ordinary expectations and common sense. It is implausible that profit-generating enterprises operate without any notion of what it is they are doing. Because the Court's review is confined to the Complaint's well plead allegations and all reasonable inferences to be drawn from them in Plaintiff's favor, the Court must decline the NFL's invitation to ignore Plaintiff's allegations and speculate unreasonably in the NFL's favor.

### b. The Facebook ID – on its own – constitutes PII.

As demonstrated above, and plausibly plead throughout the Complaint, the NFL opened a "digital door" by installing the Pixel and freely permitting Mr. Hughes's video viewing history paired with his Facebook ID to be transmitted to Facebook, an unauthorized third party. ¶¶ 4-5, 33-35, 40, 62, 66. Courts have repeatedly found that the Facebook ID constitutes PII. For example, in *Epoch Times,* Judge Hellerstein provided a concise summary of the state of the law directly undermining what the NFL argues here:

> Unlike the anonymized device serial numbers disclosed in *Robinson*, Facebook need not link the disclosed FID to personal information obtained elsewhere. The FID itself represents a particular individual. Indeed, Defendant fails to acknowledge that *Robinson* itself distinguished FIDs from the sort of device serial number disclosed by Disney in *Robinson*: "Nor is the information disclosed by Disney equivalent to a Facebook ID. . . . A Facebook ID . . . is thus equivalent to a name—it stands in for a specific person, unlike a device identifier." This view is consistent with courts in other district that have considered the very same question.

*Epoch Times,* 2022 WL 17069810, at *3 (citations omitted).[7]

Just as in these other Pixel-VPPA cases, Mr. Hughes has plausibly plead that the NFL knowingly disclosed his PII to a third party in violation of the VPPA. ¶¶ 2-4, 19, 32, 39, 41, 46, 60, 62. The NFL is a sophisticated entity that "operates a football league comprised of 32 teams," ECF No. 46, at 3. While a fully-developed record may demonstrate that the NFL was an unwitting dupe of Facebook, at this juncture the plausibly plead allegations are adequate "to state a viable claim under the VPPA." *Boston Globe*, 2022 WL 4329373, at *2.

---

[7] *See also id.* at *4; *PBS*, 2023 WL 2583118, at *3; *Gannett*, ECF No. 33, at 9-10 (Dec. 20, 2022); *WebMD*, 2022 16716151, at *5; *Patreon,* 2022 WL 7652166, at *8; *Boston Globe*, 2022 WL 4329373, at *2.

**C.      Defendant's class action waiver is intertwined with the arbitration clause it has chosen not to enforce in this matter.**

Defendant seeks to dismiss Plaintiff's class allegations based on a procedural provision in Terms and Conditions Section 19, entitled "Choice of Law, Arbitration, and Class Action Waiver" (hereafter, "CAC Clause").[8] ECF No. 46 at 23-25. However, because the purported class action waiver only applies to the procedural management of arbitral proceedings, the Court must not dismiss the class allegations.

The CAC clause inextricably intertwines an agreement to arbitrate "disputes" with a procedural limitation on class or group proceedings in arbitration. ECF No. 45-3, at 19-20. The Terms and Conditions do not attempt to limit class or group proceedings in any other Section. *Id.*, generally. The CAC Clause states, in relevant part:

> If you and the NFL do not resolve any dispute by informal negotiation, any other effort to resolve the dispute will be conducted exclusively by binding arbitration as described in this section. You are giving up the right to litigate (or participate in as a party or class member) all disputes in court before a judge or jury. Instead, all disputes will be resolved before a neutral arbitrator, whose decision will be final except for a limited right of appeal under the Federal Arbitration Act. Any court with jurisdiction over the parties may enforce the arbitrator's award.
>
> ANY PROCEEDINGS TO RESOLVE OR LITIGATE ANY DISPUTE WILL BE CONDUCTED SOLELY ON AN INDIVIDUAL BASIS. NEITHER YOU NOR THE NFL WILL SEEK TO HAVE ANY DISPUTE HEARD AS A CLASS ACTION OR IN ANY OTHER PROCEEDING IN WHICH EITHER PARTY ACTS OR PROPOSES TO ACT IN A REPRESENTATIVE CAPACITY. No arbitration or proceeding will be combined with another without the prior written consent of all parties to all affected arbitrations or proceedings.
>
> All disputes arising under this Agreement that cannot be settled through informal negotiation will be settled exclusively through confidential binding arbitration in accordance with the Consumer Arbitration Rules of the American Arbitration

---

[8] Plaintiff believes that Defendant has waived its right to compel arbitration by relying on only a portion of the Terms and Conditions. However, should Defendant attempt to subsequently compel arbitration, Plaintiff reserves all rights to challenge any attempt to compel this matter to arbitration.

Association. The arbitrator's award shall be binding and may be entered as a judgment in a court of competent jurisdiction.

*Id.*

Any reasonable user of NFL's services would understand the language of the CAC Clause to attempt to the ability of said user to participate in a class action *in arbitration*. A similar result was reached in a factually analogous case, *Fischer v. Instant Checkmate LLC*, No. 19-cv-4892, 2022 WL 971479 (N.D. Ill. Mar. 31, 2022). In *Fischer*, the Court found that a class waiver provision that was contained in an arbitration agreement that had been waived applied to the plaintiffs' claims at issue based on the plain language of the class waiver. *Id.* at *5 (finding that "[b]y its express terms, the first waiver applies only in arbitration").[9] Finding that the class waiver at issue was inapplicable, because the class waiver's text "appears amid, and is inextricably intertwined with, the Terms of Use's arbitration agreement[.]" *Id.* at *4.

Importantly, "[a]lthough the waiver, standing alone in the second sentence of this three-sentence passage, is not specific to arbitration or litigation, the sentences that precede and follow it provides 'important context.'" *Id.* (quoting *Meyer v. Kalanick*, 185 F. Supp. 3d 448, 453 (S.D.N.Y. 2016.)). The *Fischer* Court further explained the importance of "'[t]he provisions directly before and after the [first class waiver] ... concern arbitration,'" noting that the first sentence defines the set of claims subject to arbitration, and the third "elaborates on certain features of the arbitration proceedings." *Id.* (quoting *Meyer*, 185 F. Supp. 3d at 453).

Because of the importance of the overall structure and context of how contractual terms are presented, the *Fischer* Court then examined specifically what claims the contract purported to be covered by the class waiver, finding that "the phrase 'any such claims' in the class waiver

---

[9] In *Fischer*, the terms at issues contained two separate class action waiver provisions, with one being in the arbitration agreement, and a second being "[s]eparate and apart from the agreement to arbitrate[.]" 2022 WL 971479, at *2.

plainly refers to the claims that the preceding sentence requires be brought in arbitration." *Id.*

"Given this context, the [first class waiver] is most plausibly read as an explanation of the rights

that the parties are giving up in agreeing to arbitrate disputes, and *not* as an independently

effective waiver of the right to pursue a class action outside the arbitration context." *Id.*, (quoting

*Meyer*, 185 F. Supp. 3d at 453-54; *accord Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 328

(5th Cir. 2020) (citing *Meyer* with approval in construing a similar provision) (emphasis in

original)).

      Here, this Court should land where the *Fischer* court landed. First, just as in *Fischer*, the

class waiver is not only included with in the same section as the purported agreement to arbitrate,

it is fully embedded in and "inextricably intertwined" with the arbitration language in

Defendant's contract of adhesion. The CAC Clause starts with a pronouncement that the laws of

the State of New York shall apply. ECF 45-3, at 19-20. Then, moving to arbitration, the CAC

Clause states that "If you and the NFL do not resolve any dispute by informal negotiations, any

other effort to resolve the dispute will be conducted exclusively by binding arbitration as

described in this section." *Id.* The CAC Clause also states "Instead, all disputes will be resolved

before a neutral arbitrator, whose decisions will be final except for a limited right of appeal

under the Federal Arbitration Act. *Id.* After stating that "all disputes" would proceed in

arbitration, the CAC Clause's purported class waiver next states:

> ANY PROCEEDINGS TO RESOLVE OR LITIGATE ANY DISPUTE WILL BE
> CONDUCTED SOLELY ON AN INDIVIDUAL BASIS. NEITHER YOU NOR
> THE NFL WILL SEEK TO HAVE ANY DISPUTE HEARD AS A CLASS
> ACTION OR IN ANY OTHER PROCEEDING IN WHICH EITHER PARTY
> ACTS OR PROPOSES TO ACT IN A REPRESENTATIVE CAPACITY. No
> arbitration or proceeding will be combined with another without the prior written
> consent of all parties to all affected arbitrations or proceedings.

*Id.*

Then, creating the same arbitration–class-waiver–arbitration "sandwich" that was rejected in *Fischer*, the CAC Clause continued to discuss arbitral rules, stating:

> All disputes arising under this Agreement that cannot be settled through informal negotiation will be settled exclusively through confidential binding arbitration in accordance with the Consumer Arbitration Rules of the American Arbitration Association. The arbitrator's award shall be binding and may be entered as a judgment in a court of competent jurisdiction.

*Id*.

Clearly, when the CAC Clause is considered in its entirety, the class waiver language only applies to matters in arbitration, as the plain language of the CAC Clause states that "any dispute" will be arbitrated, at least twice. *Id*. ("all disputes will be resolved before a neutral arbitrator..." and "[a]ll disputes arising under this Agreement that cannot be settled through informal negotiation will be settled exclusively through confidential binding arbitration in accordance with the Consumer Arbitration Rules of the American Arbitration Association."). Because the CAC Clause's class waiver language only applies to "any proceedings to resolve or litigate *any dispute*" and "*all disputes*" will be settled via arbitration, the qualifier that "*any dispute* will be conducted solely on an individual basis" can only logically apply to disputes in arbitration. Moreover, the language "[n]either you nor the NFL will seek to have any dispute heard as a class action or in any other proceeding in which either party acts or proposed to act in a representative capacity" is similarly limited by the fact that the Terms and Conditions provide for "all disputes" to be resolved via arbitration, and as this is not an arbitral proceeding, any such language is inapplicable. As such, the Court must deny the motion to dismiss Plaintiff's class allegations.

Furthermore, all of Defendant's cited caselaw is either distinguishable based on the contract language at issue or actually supports the denial of Defendant's motion. First, Defendant cites the Second Circuit's non-precedential summary order in *Horton v. Dow Jones & Co., Inc.*,

804 F. App'x 81, 83 (2d Cir. 2020) (summary order). However, when more than a facial analysis is employed, it becomes clear that *Horton* supports Plaintiff's position. First, notably, in *Horton* the Defendant sought to compel arbitration. *Id*. Second, the arbitration agreement at issue made clear that it restricted "class arbitrations" and "class actions" *Id*. at *84. Because the contract included references to both class actions and class arbitration, the lower court found that not enforcing the class waiver would render the inclusion of the term "and class actions" meaningless, as the contract already made clear there could be no class arbitrations. *Id*. The opposite is true here – the plain terms of the CAC Clause apply the class waiver only to disputes in arbitration (because the CAC Clause purports to require all disputes to be arbitrated) and to apply the waiver language as proposed by Defendant would actually render multiple parts of the CAC Clause meaningless (which is what *Horton* requires the Court not do).

Defendant's other cited caselaw fares no better. In *U1it4Less, Inc. v. FedEx Corp.*, the class waiver at issue was a standalone class waiver with no arbitration agreement in the applicable contract. No. 11-CV-1713 KBF, 2015 WL 3916247 (S.D.N.Y. June 25, 2015). Because the issue here revolves around Defendant's choice to draft its Terms and Conditions in such a way that the class waiver applies only to arbitrations, *U1it4Less* is irrelevant and any reliance thereon would be gravely misplaced. Similarly, *Roman v. Spirit Airlines, Inc.*, deals only with a court-focused class waiver, and has no arbitration agreement in the contract at issue. 482 F. Supp. 3d 1304, 1309 (S.D. Fla. 2020), *aff'd*, No. 20-13699, 2021 WL 4317318 (11th Cir. Sept. 23, 2021). As such, it is equally extraneous to the facts at issue here.

Accordingly, Plaintiff never agreed to not participate in a class action in court proceedings, and the Terms and Conditions CAC Clause, by its plain language and by its context

applies only to limit class arbitrations. As such, the motion to dismiss the class allegations must be denied.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss should be denied in its entirety.[10]

Dated: March 23, 2023     Respectfully submitted,

By:  /s/ *Michael L. Murphy*
     Michael L. Murphy (NY 5084397)
     BAILEY & GLASSER LLP
     1055 Thomas Jefferson Street NW
     Suite 540
     Washington, DC 20007
     T: 202.463.2101
     mmurphy@baileyglasser.com

     Brandon M. Wise, Esq.*
     PEIFFER WOLFF CARR KANE
      CONWAY & WISE, LLP
     73 W. Monroe
     5th Floor
     Chicago, Illinois 60604
     T: 310.444.0734
     bwise@peifferwolf.com

     * Admitted *pro hac vice*.

---

[10] To the extent the Court grants Defendant's motion, Plaintiff respectfully requests that he be permitted to amend her complaint to address any issues the Court raises in its Order.

## CERTIFICATE OF SERVICE

I hereby certify that *Plaintiff's Opposition to Defendant's Motion to Dismiss* was filed in the court's CM/ECF system and that counsel of record will be served.

By:     /s/ *Michael L. Murphy*
Michael L. Murphy (NY 5084397)
BAILEY & GLASSER LLP